The Judges delivered their opinions. *
Judge Green.
I agree with the Counsel of the appellee, that in deciding upon questions of liberty and slavery, such as that presented in this case, it is the duty of the Court, uninfluenced by considerations of humanity on the one hand, or of policy (except so far as the policy of the law appears to extend) on the other, to ascertain and pronounce what the law is; leaving it to the Legislature, as the only competent and fit authority, to deal as they may think expedient, with a subject involving so many and such important moral and political considerations.
It is a Hedged on the part of the appellee, that an emancipation by will is, in effect, a bequest of the testator’s property in the slave, to the slave intended to be emancipated: that, in the case at bar, the legacy did not vest until the legatee attained her age of 31 years; and that, if she had died before she attained that age, the legacy would have lapsed, and the bequest have had no effect whatever;- and that, consequently, until she attained the age of 31, (the property not being changed,) the mother continued a slave, and her children born before that period, were born slaves, and so continue, by force of the rule, that the children follow the condition of the mother.
*230 This conclusion would be just, if the preliminary proposition were true, and emancipation was, in effect, a transfer of the property in a slave, to himself. But, in that event, another consequence would in this case follow; to wit, that the legacy having in fact vested in the mother, the property in the children would also be vested in her. By the common law in relation to animals, the owner of the female is entitled, jure dominii, to the increase. It may, perhaps, be doubtful, whether, according to the common law, especially in ancient times, even the temporary owner of the female, was not entitled, absolutely, to the increase. But, however this may be, there is now no question in Virginia, but that in relation to slaves^ the increase born during the continuance of any temporary interest in the mother goes, as she does, to the person entitled to the absolute property in the mother, after the expiration of the temporary interest, unless otherwise directed by the original owner of the female. This was decided as a general proposition, independent of any statutory provision, in Ellison v- Woody, 6 Munf. 368, and might be proved by reference to the uninterrupted practice of the coun-. try for more than an hundred years, under the statute prescribing the interest of a widow, in various cases, in her husband’s slaves; many of which direct, that her portion of slaves shall go after her death, to the heir, distributees or legatees, as the case may be, without any directions as to the increase, born during the continuance of the widow’s interest. Acts 1705, chap. 23, §11; 1727, chap. 11, §21; 1785, chap. 61,. § 21-25. Yet, it has inyariably been held, that the increase goes to the person entitled to the original .stock, after the life-estate expired. And this rule has become common law to us. ' The consequence is, that if the testator gave the property in Mary to his son, until she attained the age of 31, and afterwards to herself, the son was entitled to her issue until she attained that age, and she then became entitled to them.
*231 ■ But, I cannot assent to this proposition. No man cab take or hold a property in himself. If he could,' he might sell himself, and, by his own act, become a slave. Emancipation is an utter destruction of the right of property. If it be conditional or future, the condition being performed, or the time come, then, and not till then, the right of property is wholly gone. Before any rule of property can be applied to any person, his civil state must be ascertained; and when, and not before, he is ascertained-to be a slave, he becomes a proper subject of the rules of property.
The question as to the civil state of the children of Mary, born before she attained her age of 31, depends upon the true construction of the statute of 1753, which was in force at the time of their respective births, and which provided, “that all children shall be bond or free, according to the condition of their mothers, and the particular directions of this act.” The latter part of this clause has no direct application to the case at bar; for, the act gives no particular directions applicable to this case. In the case of an emancipation, upon a condition or contingency, or at a future period, and children horn, pending the condition or contingency, or before the time appointed for the emancipation to take effect, this act is susceptible of various constructions. 1. If the right to freedom in the mother he contingent, or depending upon a condition, the children may be considered as bom slaves, (their mother then being a slave,) and not entitled to the benefit of the contingency or condition, upon which the mother would be entitled to her freedom; or, 2. They may be considered as born slaves, but with all» the rights of the mother to be free, upon the happening of the contingency, or performance of the condition; or, 3. They may be considered as horn slaves, but upon the condition being performed, or the contingency happening, the mother being, free, the children may be deemed free from their birth, by-relation; or, 4. If the mother is to be emancipated at a future time, the children may be considered as born slaves. *232 without the benefit of the right of the mother to future lij^grty; or, 5. With that right; or, 6. They may be con- . sidered as born free, upon the supposition that a vested rightto future freedom in the mother, puts her in the condition of one free, but bound to service for a limited time. No case has occurred, in which these questions have come under the consideration of the Court of Appeals, except that of Pleasants v. Pleasants, 2 Call, 319. That case was. presented under .such circumstances, as to invite the attention of the Court .to each of those alternatives in the construction of the statute of 1753; and, although the Court did not expressly refer to the statute, they must, of necessity, have considered all the questions which could arise upon its construction. For, in that case, some of the slaves were born of mothers who had a contingent right to freedom, before the contingency happened, and some, of mothers, who, after the happening of the contingency on which their right to freedom depended, were not immediately free, but entitled to their freedom at a still future and fixed period. The case was this : John Pleasants died in 1771, when a law was in force, which prohibited the emancipation of slaves, except by permission of the Governor and Council, and for meritorious services. By his will, he bequeathed his slaves to the members of his family, with a direction that, so soon as it should be allowed by law, his slaves then (at the making Of his will,) born, or thereafter to be born, whilst their mothers should be in the service of the testator, or his heirs, should be free at the age of 30 years. In 1782, a law passed, permitting emancipation. Chancellor Wythe decreed, that such of the slaves as were of the age of 30 years, when the law of 1782 took effect, were then (at the passing of the law,) entitled to their freedom: (these, of course, were born before the testator’s death;) that, those born before the testator’s death, and not 30 years old at the time of the decree,would be entitled to freedom when they attained the ago of 30. The principle of this branch of the decree, ex *233 tended to those born in the testator’s life-time, and who attained the age of 30 years after the passing of the act of 1782, and before the decree, although this class was not expressly provided for in the decree: that, those born siuce the statute was enacted, were born free; and, that those born between the time of the testator’s death, and the passing of the act, would be entitled to freedom when they attained the age of 30. This last branch of the decree did not distinguish between those born, during that period, of mothers over or under the age of 30, and is not noticed in Mr. Call’s report of the case. Judge Roane was of opinion, that as to all the slaves in esse at the time of passing the act of 1782, without regard to the time of their birth, whether before or after the testator’s death, such of them as were then (at the passing of the act,) of the age of 30, were immediately, upon the statute taking effect, free; such were, of course, born before the testator’s death; and, such of them as were under that age, were entitled to their freedom when they should arrive at the ago of 30: (Of these, some were born before, and others after, the testator’s death:) That, the right, to freedom vested in them upon the passing of the act; and that such of them as were then under the age of 30, thereby became free persons, hound to service until the age of 30: that, their children, born after the act of 1782, being bom of free persons, were free; and that the testator had no power to control their liberty, by binding them to serve until the age of 30, as the will prescribed. Judges Pendleton and Carrington, agreed in a decree, that the slaves bom before the testator’s death, and then (at the time of the decree,) over 30, were free at the time of the decree, (and, consequently, that those over 30, at the passing of the act, were then free:) that, all born before or after the testator’s death, then (at the time of the decree,) under the age of 30, should serve until they attained that age, and then be free; and that all the descendants of the females, in all generations, horn of mothers, under the age *234 of 30 at the time of their b|rth, should serve until they' attained the age of 30, and then be free. This last provision °f the decree was avowedly founded wholly on the directions of the will to that effect: and no other reasons were assigned for it. The construction, therefpre, which was given to the statute, in this case, was as follows: 1. That, a testator might emancipate upon a contingency, and that the children born of mothers who were to be free upon the happening of the contingency, and before the contingency happened, were born slaves, and were not entitled to the benefit of the contingency upon which the mother was to be entitled to her freedom, so as to be free upon the happening of the contingency; nor were to be considered as born free by relation. For, all the Judges agreed, that those horn after the death of the testator, and before the passing of the act, were bound to serve until the age of 30. The two Judges, whose opinion decided the cause, declared, that this service was imposed, in pursuance of the will of the testator; and although the other two assigned no reason, .they must have proceeded on the same ground; for, this obligation to service could notarise from the condition of the mother, if the children followed that condition, so as to be entitled to the benefit of the contingency, upon which she was to be free; for, in that case, they must have been born, to be free at the same time, and under the same circumstances, when, and under which, she acquired her liberty; and, if so, then the testator had no power td impose upon them a service, from which the law exempted them, from their birth.
If it should be said, that the right to liberty, being derived only from the testators will, must be taken with all the modifications and conditions imposed by the- testator, and that as he may give a female slave to one, and her future increase to another, that for the same reason he may emancipate a slave in futuro, and either direct her future increase to serve for a limited time, or to' remain absolute slaves, notwithstanding the law has declared that the chil *235 dren shall follow ihe condition of the mother, and of course, he free when she would be free, if her future right to liberty was a part of the condition referred to by the law; I answer, that the power of an owner to give a slave to one, and her future increase to another, results from the right of property, which the owner has in the accessions to, and increase and produce and issues of, his property, over which he may exercise an absolute control for a time, limited only by the policy of the law to prevent perpetuities. But, in case of emancipation of the mother, the law prescribes that the children, from their birth, shall be bond or free, according to the condition of the mother; and the testator can no more control the effect of the law, if it gives future freedom to the children, in case the testator had been silent on the subject, than he could give his property upon a condition not to enjoy or alienate it. If he could, he might on the same principles, give immediate freedom to the mother, and direct that her future issue should serve until a given time, or be slaves forever; or he might give to a slave, freedom for a limited time, and direct effectually, that he should again be a slave, after the lapse of that time; propositions, which cannot be maintained, and which are condemned both by the common and civil law, as will be hereafter seen.
It follows, that they were, in the opinion of all the Judges, born absolute slaves, and would so have continued forever, but for the efficacy of the will in emancipating them also, at the age of 30.
2d. That a testator might emancipate at a given future time; and the two Judges whose opinions "decided that cause, thought that in such case, the children born of mothers absolutely entitled to be free at a future fixed period, and before that period arrived, were born slaves, the mothers being slaves at the time of their births, and wore not entitled to the right of future liberty which the mother had. For, they decreed, that the children, born after the passing of the act, and to be born in all future time of mo *236 thers under the age of 30, were bound to service until the age of 30, in pursuance of the will; which, for the reasons before stated, could only have been in consequence of their being born absolute slaves forever, and emancipated at the age of 30 by the will of.the testator. Upon this point, the Chancellor and Judge Roane were of opinion, that so soon as the right of the mother to future freedom became certain, she was free, and her children born free; and that the testator had no power over, and could not impose-any service on, them.
The result, then, of this case is, that according to the opinions of all the Judges, the “ condition of the mother,” which was to decide whether her children should be bond or free, was the actual civil state at the time of their birth, as slave or free, without regard to her right to, or hope of, future liberty. Even the Chancellor and Judge Roane would have thought the children absolutely slaves, if the mothers- had been slaves at the time of their birth, with a right to future liberty.
The case at bar is one, in which the right of the mother to freedom at her age of 31 years, was unconditional and certain; and as the Judges differed as to the effect of such a state of the mother upon her children, and the case of Pleasants and Pleasants, may not be considered as conclusive authority in point, as to that question, it may be necessary to examine it, upon the principles of our laws in relation to this subject.
A short review of the history of slavery and servitude in Virginia, and the laws relating thereto, will throw light upon this subject. Negro slaves were first introduced here ' in 1620. No law was enacted in relation to their civil condition until 1662. They were held as absolute property, and the children of female slaves were held to be slaves, without doubt, until the question was raised, (probably in reference to the English law of villenage, by which the child of a freeman by a neif was held to be free,) whether the child of a freeman by a female slave was bond or free. *237 To solve this .doubt, the act of 1662 was made, reciting that, “ whereas some doubts have arisen, whether children got by an Englishman upon a negro woman, should be slave, or free.” It was enacted, that all children born in this country shall be held bond or free, according to the condition of the mother. The phraseology of the act shews, that the rule which had before prevailed, was adopted: a rule, conforming to the civil law as to slaves, and contradicting the rule of the common law as to villains. This Jaw was re-enacted in 1696, without the preamble; and afterwards re-enacted repeatedly; and, Anally, in 1753, with the addition of the words “ and the particular directions of this act.” In 1670, an act passed, declaring that “all servants, not being Christians, imported into this colony by shipping, shall be slaves for their lives; hut what shall come by land, shall serve, if boys or girls, until 30 years of age; if men or women, 12 years and no longer.” This latter clause related to Indians. In 1691 an act passed, directing that the children of any woman servant, or any free Christian white woman by negroes or mulattoes, shall be bound out as servants, until they attained the age of 31 years; re-enacted in 1705 and 1753. An act of 1723 provided, that the children of any female mulatto (referring to the acts of 1681 and 1705) or Indian, (referring to the act of 1670) bound to serve until 30 or 31, shall serve the master or mistress of such female, until they attain the age to which their mother was bound to serve. This act was x-e-enacted in 1753, and continued in force, as well as that of 1691 and 1705, until 1765, when they were repealed, and the children of servants, or of free white Christian women by negroes or mulattoes, were directed to be bound out, the males until 21, the females xxxxtil 18; and the children of mulatto women, bound to servo until 31, (by the acts of 1 691 and 1705,) were to serve the master or mistress of such xnulatto woman, the males until 21, the females until 18.
*238 The act of 1753, re-enacting that of 1662, with the ad¿¡tion of the words “ and the particular directions of this act,” had in it a provision in the terms of the act of 1723, *n ration t° the children of mulattoes bound to service, until they attained the age of 31, requiring such children to serve to the age to which their mothers were bound to serve, and it is to this provision that the words “ and the particular directions of this act” referred.
From the first introduction of slaves into Virginia, the owners of slaves, without any statutory provision upon the subject, seem to have exercised an unlimited power of emancipation, until 1696. For, many laws were made before that time, in relation to free negroes; and in that year a law was made, reciting many inconveniences arising from free negroes, and providing, that whosoever emancipated a slave, should transport him from the Commonwealth; or, on failure to do so in six months, he should be transported by the church-wardens; and that the former owner should pay to them £10 for defraying the expense of transportation. This act did not limit or restrain the power of emancipation. But, in 1723 it was enacted, that no person should emancipate a slave but for meritorious services, and by permission of the Governor and Council. This act continued in force until 1782, when an act passed, authorising any owner of slaves, by deed or will, to emancipate such slaves, “who shall, thereupon, be entirely and fully discharged from the performance of any contract entered into during servitude, and enjoy as full freedom as if they had been particularly named and freed by this act;” provided always, “that all slaves so set free, not being in the judgment of the Court of sound mind and body, or being above the age of 45 years, or being males under the age of 21, or females under the age of 18 years, shall respectively be supported and maintained by the person so liberating them, or by his or her estate;” or in default, the Court might order a distress on jais estate for that purpose.
*239 Upon these acts, I observe, that Indians and the children of white women by a negro or mulatto bound to serve until 30 or 31, were considered free and not slaves, and bound as servants'. For, the direction of the acts of 1691 and 1705 is express, that they shall he hound as servants. Their children were born free, and liable to no sort of service to the master of the mother, until the act of 1723 was passed. If the act of 1662, re-enacted in 1696, declaring, that all children should be bond or free, according to the condition of the mother, had been construed to give to the children of a mother, entitled to her freedom at a future day, or upon a contingency, the benefit of her right, so as to he free when she was, though born slaves; then the children of a servant, for the same reason, though born free, would he hound, as she was, to service, until she was entitled to be discharged from service. But they were not so hound; from which I conclude, that the civil state of the children, with all its consequences, was determined by the civil state of the mother, at the time of their birth, without regard to the present obligation of a free woman, to serve, or the preseut right of a slave to he free thereafter. And such was the reasonable construction of the statute of 1662; for, it recites, that some doubt existed, whether children of an Englishman, by a negro woman, were slaves or free, and directs, that all children shall be deemed to be bond or free, according to the condition of the mother, that is, slave or free, as the mother at their birth was. The sole enquiry then, is, whether, at the time of the birth of the children, the mother be in fact slave or free, without regard to what may be her future state. The opinions of Chancellor Wythe and Judge Roane, that a present right to future freedom, is present, freedom, with an obligation to serve as a servant, would directly counteract the policy of the law of 1782, in regard to emancipation, unless the former owner was bound to support the children born during the period of service of the mother, the males, until they attain the age of 21, *240 and the females, until the age of 18. That act provides, that all such children emancipated, shall be so supported. The children of a free person not bound to any service, in Senel'al> would not be a burthen upon the parish, for the parents would be bound, and commonly able to support them. But, the children of a free person bound to service, must be supported by the parish, for the parent cannot have the means of supporting them. The former owner could not, upon such a construction, be bound to support them; for, he did not emancipate them, they being born free. The consequence, then, of this construction would be, that the public, in consequence of the emancipation of the mother, with an obligation to future service, would inevitably be burthened with the support of the children, until they arrived to an age when they could be bound out as apprentices, which seems to me to be contrary to the policy of the law. Another consequence of such a construction would be, that a slave, so emancipated, male or female, whilst bound to service, would have all the privileges of a free negro, might acquire and enjoy property, sue and be sued, and even maintain litigations in a Court of Justice with his master; and be liable to be tried and punished for offences, as a free person, and not as a slave;—a state of servitude, directly against the policy of the law of 1765, the object of which seems to have been, to allow no middle state between slavery and absolute freedom, except apprenticeship during infancy. Again; as no person can, of his mere will, bind a person born free, to service, so I apprehend, that the owner of a slave, having made him free at present, cannot bind him to any future service, such an obligation being inconsistent with the grant of present freedom. Such an attempt would be nugatory upon principles of common law, and reprobated by the terms of the statute of 1782; for he would not, from the time of emancipation, “enjoy as full freedom as if he had been particularly named and freed by that act.” And both by the civil and common law, a slave or villain, the *241 moment he was manumitted in any way, was out of the power of the master forever. Libertas ad ternpus dari non jrrotest. Ideoque si ita scrip turn sit, tisque ad decem annos liber esto, temporis adjcctio supervacua est. Dig. Lib. 40, tit. 4, § 33-34; Vin. Abr. tit. Villcin, K. pl. 8. And finally, the law authorising emancipation by will, if it attached any consequences to an emancipation by will, contrary to the will of the testator, would frustrate itself; and the consequence would be, that if the will could not, according to law, have the efFect which the testator intended, it would he void and of no effect. Could it he said, if a testator devised that a female slave should be free at the age of 30, and that her issue in the mean time should belong as slaves to his family, that his will which intended to confer future freedom, did in fact confer, in spite of his expressed intention, immediate freedom on the mother, and thus frustrate the intent of the testator as to the children, by giving them a birth-right to liberty ? This would he to emancipate by law, and not by will. The testator, in the case at bar, having given a slave to his son in general terms, and directed that she should be free at the age of 31, intended to give her, and that he should have power over her as a slave. That intent was lawful, and should be carried into efFect.
Upon the whole, I am of opinion, that the children of Mary were horn slaves, without any right, to future liberty. And, this is in strict conformity with the civil law, which may have been in the contemplation of the Legislature, when they passed the law of 1663, and the subsequent acts to the same effect. By that law, the civil state of the child was determined by that of the mother, at the time of the birth. “ Serví aut nascuntur aut fiunl Nascunlur ex ancillis nostrisInst. Lib. I, tit. 3, § 4. They might he emancipated in futuro upon a condition, or at a certain time, and, in the mean time were not free, hut slaves. “ Si. in diem auiem libertas data est, vel *242 sub conditione, tunc competit libertas cum dies venerii, vei conditi0 extiterit.” Dig. Lib. 40, tit. 4, § 23. “ Statidiberum medio tempore servum heredis esse, nemo est clui ignorare debeat; ea propter noxse dedi poteril.” Dig. Lib. 40, tit. 7, § 9; and they were called Statuliberi until they were actually free. “ Staiuliber est, qui siatidam et destinatam in tempus vel conditionem libertatem habet.” Dig. Lib. 40, tit. 7, § 1, and Lib. 40, tit. 1, 2, 3, 4, 5, 6, passim. The children born of a woman in this condition, were slaves to her then owner. Statulibera, quicquid peperit, hoc servum heredis est. Dig. Lib. 40, tit. 7, 16. And, so strict was this rule, that if a female slave were bequeathed to another, to be by him set free at a future time, or upon a condition, and the time had come, or the condition been performed, but the slave not actually manumitted,, and, thereafter, before an actual emancipation, had a child born, the child was a slave belonging to the person bound to manumit. But, in that case, he was bound to transfer the child to the mother, that he might be, by that means, set free. Dig. Lib. 40, tit. 5, § 13. A staiuliber was, in almost all respects, in the same condition as other slaves. “ Statuliberi a ceteris servís nostris, nihilo pene dijferunt. Et ideo quod ad actiones vel ex debito venientes, vel ex negotio gesto, vel ex contractu, pertinentes, ejusdem conditionis sunt statuliberi cujus eseteri. Et ideo in publicis quoque judiciis, easdem poznas patiuntur quas eseteri servi. ” Dig. Lib. 40, tit. 7, § 29.
I cannot perceive the reason (for none is assigned,) upon which Chancellor Wythe and Judge Roane distinguished the case of a slave emancipated upon a contingency, and one directed to be free at a future period, as to the state of their children born before- the contingency happens, or the appointed time comes. The contingent right to future freedom, is as much a part of the condition of a 1 slave, as a certain right to future freedom is; and, if the *243 children were entitled, in the one ease, to participate with their mother in this benefit, it seems to me, they ought in the other. But, if any. distinction can exist between the two cases, it cannot apply to the case at bar; for, here the testator wills, that Ma?'y “ shall be free as soon as she arrives at the age of 31 years;” and, whether she would live to that age, was contingent and uncertain.
It may be further observed, that an act which passed in 1806, may be considered as a Legislative construction of the pre-existing laws on this point, and a recognition of the proposition, that a slave emancipated in futuro continued to be a slave, until the appointed time came. That act provided, that “ if any slave, hereafter emancipated, shall remain in this Commonwealth more than twelve months after his or her right to freedom shall have accrued, he or she shall forfeit all such right,” and be sold, &c. This act was passed with a full knowledge, that emancipations to take effect at a future time, were most common for’ making a provision for the children, and especially the widows, of the testator, by giving, for instance, his slaves to his wife for her life, and after her death to be free. If ¡he construction of Chancellor Wythe and Judge Roane were correct, and they were free immediately; in that case, either the emancipation must be declared to be ineffectual, or the intent of the testator in favor of his wife, or of the slaves, or of both, must be frustrated by the operation of this law. • For, if their right to freedom accrued upon the testator’s death, then, within a twelve-month ¡hereafter, they must leave the Commonwealth; in which case, the intent of the testator, in relation to his wife, would be defeated; or, if they departed not, then they would be sold for the benefit of the overseers of the poor, and the will of the testator be frustrated, both as to his wife and the slaves; or, if neither of these consequences followed, then such an emancipation, with an obligation to future service, would counteract the policy of this law *244 also. On the contrary, the construction, that such an emancipation leaves the slaves in absolute slaveiy during the widow’s life, and that their right to freedom accrues onty on the death of the widow, effectuates the intentions, both of the testator and the law, without producing any inconvenience.
Considering, therefore, that a slave emancipated in futuro, continues in the mean time a slave to all intents and purposes, I am led to the conclusion, that her children, born in the mean time, ar.e born slaves, and so continue, notwithstanding the right of the mother to freedom at a future time, in which they do not participate by the literal construction of the act of 1753, taken in connection with the terms of the preamble to the original law of 1662; by the spirit and policy of all the other Legislative acts which bear upon the question; by analogy to the civil law, and by the authority of Chancellor Wvthe, and all the Judges of the Court of Appeals, who sate in the case of Pleasants and Pleasants. '
The only other ground upon which the children of Mary could claim to be free, is, that it may be supposed that the intention of the testator was to emancipate them also, and that this may be fairly gathered from the will. I have no doubt, but that, if, the idea had occurred to him, that she would probably have children before she attained her age of 31, he would have expressly provided that they also should be free, which could have been effected by the addition of these words, “and her increase.” His not having done so, satisfies me entirely, that he never thought of, or intended to make any provision for the children. And if so, it was a subject in relation to which he had no thought, or will, or intention, and is consequently to be disposed of according to the law of the land.
In considering this case, I have not been inattentive tó the favor shewn by the common law to liberty. Co. Lit. 124, b. But, it is my duty to execute the law as I find *245 it, according to its spirit and policy. And I must say, with the civilians, in relation to this case, Quod quidem perquam durum est, sed ita lex scripta est.
The children of Mary being ascertained to be slaves, it is unnecessary to the purpose of deciding this cause, to consider to whom they belong.
I think the judgment is right, and ought to be affirmed.
Judge Cabell, concurred.
Judge Brooke.
If the appellants, the children of Mary, are entitled to freedom, it cannot be by force of any thing in the will, under which she has obtained her liberty. It was highly probable, that she would have children before she attained the age of 31; yet, they are not noticed nor alluded to by the testator. He might have strong reasons for liberating her, when she should amve at the age of thirty-one, which did not apply to her children, born before that period. It may have been unjust to his family to extend his bounty to them also. However that may be, it is enough, that by no reasonable construction of the will, they can be included in it, or derive any benefit under it. They must claim their freedom on the rule, that the children shall be bond or free, according to the condition of the mother;—a rule, probably adopted from the civil law, by the act of 1662, and repeated in several subsequent acts, down to 1753. As to her condition at the birth of the appellants, according to the will, she was a slave until she attained the age of 31. It only declares her to bo free when she shall arrive at that age.1 If she had never attained that age, it would have been wholly inoperative as to her, and her children would have had no pretensions to freedom. The idea, that she was free from the death of the testator, and only held to service until she attained the age of 31, is wholly inconsistent with the obvious intention of the testator. . It is inconsistent, also, with the provisions of the act of 1782, for the reasons sta, *246 ted by the Judge who has preceded me. Their claim is to ffl)erf;yi and not to property. The rule partus sequitur ventrem, is a rule of property, not of liberty, applicable to questions of property decided by this Court, and has no application to the question now to be decided. The rule, that the children shall be bond or free, according to the condition of the mother, is a rule of a different character, and has received a different exposition. It imports the condition at the time of the birth, in exclusion of any future right to liberty. It does not include a remote event, which may never happen, nor any right of which the mother is not in the enjoyment, at the time of the birth. It has been so expounded by the writers on the law, from which it was borrowed by our act, on grounds of policy and humanity, equally applicable here. The case of Pleasants v. Pleasants, is not, to say the most of it, in hostility with this construction.
The Court is unanimously of opinion to affirm the judgment.

 Judge Coaster did xiot sit in this cause.